at all, or argument not to exceed 15 minutes per side. Mr. Robert Burns for the appellant. Thank you, Mr. Burns. Your Honors, good morning. Robert Burns of the Nashville Bar. I'm here on behalf of my client, Detective Charles Pierce of the Centreville, Tennessee Police Department. I've reserved two minutes for rebuttal on my argument. I'm here today because I submit that the case that we tried last, about a year ago, raises important issues involving probable cause and arrest warrants. And I submit that this case also begs two questions to be answered. One, when is enough enough in terms of information to establish probable cause? As it relates to an officer, a law enforcement officer, who finds himself in the position that Detective Pierce did in this case, now with a verdict hanging over him, what else does an officer in Detective Pierce's position need to do to protect himself from civil liability in a case of this nature? I want to start off by saying that this case does not involve the actions of a brand new rookie police officer. Detective Pierce had over two decades of experience. The record was clear that what he did with respect to the investigation and the issuance of the warrant concerning Mr. Dodd is what he has done many times before. In addition, I want to point out that Detective Pierce did not go looking for this situation. The situation came to him. This wasn't a scenario where he ran into the Simmons family members on the court square in Centreville and decided or suggested to Mr. Chandler that he needed to prosecute or to seek an arrest warrant. It was the contrary. My appeal in this case turns largely on the record, and I want to talk about some of the high points that we think are in the record, proof that came in that is uncontested before you today. To begin with, Detective Pierce didn't know anything about the McDonald's incident until he went to work two days later. He didn't really know anything about the details of the McDonald's incident until he was called up to the courthouse to take these statements and to interview the Simmons family members. We know from the record that earlier that same day, Monday, October 24, 2011, the Simmons family members, on the direction and suggestion of one of the responding officers, Danny Roberts, went to the courthouse, spoke with people in the clerk's office, and started the process of seeking ex parte orders of protection. They filled this information out under penalty of perjury. The court clerk's staff reviewed it, saw no issue with it, thought that the information was accurate and reliable. That was submitted to a local General Sessions judge who did the same thing, and that resulted in the orders of protection being issued. There was proof in the record that someone in the clerk's office suggested to the Simmons family members that they then seek an arrest warrant and told them to go downstairs in the jail. That's what they did. That's where Detective Pierce comes into this situation. Detective Pierce went up in response to a call. He was one of only two officers that were working that day, and because his fellow officer, Mr. Simmons, could not take the call for obvious reasons, he responded. When he got there, he spent some time with Pamela Simmons, with Mr. Chandler, with the two other family members. He asked them why they were there. They explained to him what had occurred, what they wanted to do, that they had orders of protection, ex parte, granted. But he then said that if you want to seek a charge against Mr. Dodd, or do anything else related to the events that occurred at McDonald's, I'm going to need to take statements from you. And he gave them two forms, just like this, asked them to fill it out. They did that in his presence. He read them. He reviewed them. They signed these forms under penalty of perjury. The information seemed generally consistent with what they had ordered. At what point along this story did he know that the two officers who had gone to the scene had found no reason to file any charges? That happened the same day, because immediately after he met with them and these statements were produced, he then went to speak with Officer Roberts and Officer Witherspoon, because the Simmons family members identified for him who the officers were that showed up at McDonald's. He talked to both Roberts and Witherspoon. Roberts made some indication that he did not think that a crime had occurred, but we submit that the circumstances had changed now, because these statements had come in, and the victims to the crime, the aggravated assault, the incident at McDonald's, now wanted to pursue charges. Because there had been no documentation done on the day that Roberts and Witherspoon went to McDonald's, we have the now somewhat infamous, this statement has been hotly debated as to when it was made and when it existed. But the proof, we say, is uncontested that Roberts produced this statement, hand-wrote it out in his own hand, the same day that Pierce asked him to do it. This statement he reviewed, Pierce, he compared it to the two witness statements. We submit that this statement from Roberts is not exculpatory, but because of the questions that Detective Pierce had as to exactly what happened, whether there was a crime, and if there was an assault crime, what the type of the crime was, principally because Detective Pierce testified that he had a question in his mind, because no one had indicated that Mr. Dodd, when he was in the confrontation with the Simmons family members, having the gun on his side in his holster, he did not bring it out like this. That is not disputed in the record, but that was part of the basis, perhaps the principal basis, as to why Detective Pierce had questions, and being a cautious officer, not immediately taking this information and seeking a warrant, he went to the best resource that we say that he had available. And that, of course, was the local district attorney, or the assistant district attorney, Kate Yeager. Ms. Yeager, I called as a witness. She testified that she remembered the event, remembered her interaction with Detective Pierce. She kind of chuckled at trial, because she said that she was dressed up that day. It was a court day. She remembered sitting down with Detective Pierce. He went over with her the information that he had at that point in time. They discussed what this may be. There have been issues raised in this case about whether this statement existed, as I've pointed out. Ms. Yeager, General Yeager testified that she couldn't remember exactly whether she had this in her hand, but she was aware of the information that Roberts and Witherspoon had, and was principally aware that Roberts and Witherspoon decided not to do anything that day, and that they had questions as to whether or not there was a crime, or that they said that there was not a crime. But part and parcel of the information that Pierce provided to her included that it had gone, more or less, to the next stage, and that we had these orders of protection that had now been issued, and we had the two witness statements. She said, in her capacity as the prosecutor who would have handled this charge, and did handle the charge for a limited period of time, she told Detective Pierce that, I think that there's probable cause under these circumstances for an aggravated assault charge. Now, I don't have the time, unfortunately, to go through the many points that we solicited from her at trial in our brief that's on pages 36 and 39 through 45 of the leading brief that we filed. But one portion of her testimony that I think is relevant, that I want to repeat, is she said, quote, I would not have agreed, or asked him to, or okayed, or asked him to do an aggravated assault warrant if I didn't think that. There was no question at trial that Kate Yeager said probable cause existed. I told Pierce that. We talked about it. More so, and I think even more compelling in light of the subsequent events that later took place, the TBI investigation, and it should be noted that Yeager was the one that was involved in the initiation of the TBI investigation. But she testified at trial that even despite knowing what she later learned in terms of what came out of the TBI investigation, her opinion on the existence of probable cause as it existed during the week of October 24, 2011, did not change. So, here we are with Detective Pierce. This case could not get dismissed on summary judgment. We go to trial, and despite the proof that we say we put into the record on the issue of probable cause, we have a jury that returned a verdict against Detective Pierce, only against Detective Pierce, in the amount of $75,000, which is approximately 75 times the amount of out-of-pocket expenses that Mr. Dodd, through counsel, proved. We've also raised issues in this case over the nature of the damaged testimony and proof that was presented. There were numerous examples of testimony provided by Mr. Dodd and his wife about his medical condition, his emotional condition. There was no expert medical proof called to substantiate that. There was no proof, no witness called from his former employer to substantiate that the four or five months after he lost his job, or four or five months after these events occurred, he lost his job at the City of Franklin, and that there was a causal connection to that. And finally, with due respect to counsel, we have argued that a highly inflammatory closing argument likely influenced the jury, especially considering the amount of damages that were awarded on what we say is, frankly, a scarcity of proof to support that. The issue in this case is whether or not, based upon the record before you, if there is any evidence that shows that my client, Detective Pierce, intentionally, deliberately, recklessly, knowingly, somehow withheld, suppressed, concealed, or altered evidence that was material to the determination of probable cause. Respectfully, I submit that it is silly to even make that argument when you look at the proof and you look at what Detective Pierce did. How did Judge Haynes get that wrong? Well, originally, he thought that there were disputed issues of fact, so he denied my motion for summary judgment. And candidly, Judge, I think what happened at trial is after the proof was closed, we got into a debate about some language or some wording that I used in my closing argument, which, as I recall, then resulted in a direction or a ruling from Judge Haynes where he instructed the jury to completely disregard the testimony of both Kate Yeager and Agent Harmon from the TBI. And he told the jury that they only could consider the four squares of the warrant itself, and they should not take into consideration any other testimony. We have argued that that was prejudicial. I couldn't undo that bill or unring that bill, and I couldn't bring either of those two witnesses back. Now, I think I'm going to try to touch briefly on what I anticipate Mr. Dodd's counsel will point out. Again, they have spent a lot of time and a lot of emotional energy, if you will, on the Roberts statement and when it existed, who did it, whether Pierce had it, whether Pierce had this information and talked to Yeager about it. To suggest or to try to argue that this did not exist would force you to conclude that not only Pierce but Yeager, an attorney who has no dog in any of this, and then Roberts himself all perjured themselves at the civil rights trial. That didn't happen. It has been shown repeatedly through testimony back and forth that this existed at the time that Pierce went to talk to Yeager. There's an affidavit that was submitted in support of the town's motion for summary judgment that Roberts signed off on August 12, 2013, Docket Entry 80-2, in which this issue again was raised. And he said that I wrote this report and I hand-delivered it to Officer Pierce on the same day, October 24, 2011. They have raised issues as to whether or not the information in the Roberts report is exculpatory or not. Respectfully, I think we must be reading two different reports because this is not exculpatory information. There is information in this report. I've highlighted it here for the Court's reference. I know that you have requested these exhibits. We've pointed out these sentences in our reply brief and we put this in. This information is consistent with what was said before. I submit I see that I'm out of time. I apologize, but I see that the verdict in this case was, respectfully, a travesty as to my client. There was nothing that was unprofessionally or inappropriately done to support it. Good morning. John Beam representing Earl Dodd. With me is Desiree Goff. She tried the case with me and is attending today to watch. Walter Earl Dodd was a successful civil litigant in a 1983 case. This case started back on November 9, 2011, when he was in an open courtroom in a public place and was arrested for aggravated assault. He was put in jail that day and booked. His wife hocked the car and got him out of jail. She filed a written complaint with the mayor. She couldn't find the incident report. Mayor Bond couldn't find the incident report. Mayor Bond turned it over to Acting Chief Carroll. Acting Chief Carroll couldn't find an incident report. He testified that he instructed Officer Roberts to make a report. Sharp difference in our facts. Well, the scene occurred when... So you agree with counsel, Mr. Burns, that all three individuals committed perjury? No, I do not. I think that's going way further than this record needs to go. They did testify contrary to your theory. There is a credibility issue with when the report exists, yes. Are we saying the same thing? I'm asking, they testified to facts contrary to what you... Yeager testified. She wasn't sure she saw a report. Excuse me. Yes, let me finish the question. I hadn't finished the question. Yes, Judge Cook. Yes, please, excuse me. So I just hope you could give me a direct answer on that. It does require us to find that those three individuals perjured themselves in saying that the report existed when they testified that it did. And you are telling us that it did not exist, and therefore they committed perjury. What I'm telling you that, like Judge Haynes instructed the jury, that Yeager's informal sit-down meeting was really not an investigation, and whether she had a written report or an oral representation doesn't matter. What we're looking at is what went on the arrest warrant. I guess you didn't hear my question. I did hear your question, and your question is, did she perjure herself? She and Roberts and Pierce. Roberts. They testified to the contrary of what you tell us are the facts as you understand them. And so they contradict what you say here today. Their testimony contradicts. The existence of the report and when it came into existence is unknown. They testified to what they say was in existence. They say it was in existence, and my point is that's not a critical fact to our analysis today. And, yes, they may have perjured themselves. Perhaps they did not. The existence of the report is not a critical fact that the case turns on. In this case, the jury determined there was no probable cause for the arrest, and they put themselves in the prudent person's standard, and they say Officer Pierce had available facts, and they concluded there was no probable cause. Judge Haynes has a similar legal question for qualified immunity. He puts himself in three roles and looks back. He puts himself in the role of the objective officer, and he says, does the objective officer have the ability to know that there's a constitutional issue and that a constitutional issue is violated? And then he puts himself in the seat of a reasonable juror, and he asks himself, can a reasonable juror find that there was a reckless omission of its sculptory evidence? In this case, Officer Pierce came back to the station, Officer Witherspoon and Officer Roberts said, there is no crime here. There was merely arguing. No one was threatened. This matter was handled. That was their testimony. And so Judge Haynes, in his qualified immunity analysis, says, well, a reasonable jury could find this a reckless omission. Then he goes to the question of materiality. And you call it a reckless omission of exculpatory evidence, so this court would have to agree with you that there's something exculpatory in that statement. Not in the written statement, but in their oral statements, because a reasonable officer who had other things available would have gone out and searched them out after hearing the responding officer. What's your best case from this circuit that says that an officer has to do additional investigation when he has the kind of statements that this officer had from the complainants? The best case is probably a United States Supreme Court case of Langdon v. Haynes.  In Langdon v. Haynes, the defendant tried to argue that we had one reliable, trustworthy source, and that's all we need for probable cause. And the court in that case, Langdon was a clinic protester, and he was arrested for disorderly conduct. But the court said no, one reliable source is not enough for probable cause because we look at the prudent man standard. And the prudent man standard, if there are other readily available witnesses, a prudent officer must consider them. And in that case, Officer Haynes had pushed away one of the eyewitnesses at the scene and said, tell it to the judge, I don't want to hear it. Well, he had a perfectly good explanation. And in this case, Officer Pierce has essentially pushed away the responding officers who were there at the scene, who interviewed, who did their job, who didn't think there was enough to merit field notes or an incident report. I hate to interrupt you, but I do not see Langdon v. Haynes in your appellate brief. Langdon v. Haynes is in our brief. Now, I may not have gotten it cited at the front, but I was quoting. Not cited at the front. Why would that be? That would be my oversight here. Let me see if I can help the court with a page on that. The case is also, Langdon v. Haynes is also cited in the Sykes case. And we rely extensively on the Sykes case. This has a similar outcome. In Sykes, Kimberly Sykes and her coworkers at a Sprint office come to work, and there are armed men who come in and rob the place. Then Sergeant Anderson comes, and Sergeant Anderson basically says, this was an inside job, two men weren't involved, and he watches the video, and he fails to tell that he saw two armed men, and so he excluded evidence. And Sykes is. . . That would be very reckless, wouldn't it? That would be very reckless. Is that our case here? Our case. . . We're talking about the duty to go. . . A little further. Find more witnesses and ask other questions and not rely on the statements. That's correct. So maybe you do have a case that answers Judge Batchelder's question, where there's a duty. . . I mean, not talking about key things on a video seems a bit different. Well, it does seem a bit different. The constitutional analysis is we can't push away readily ascertainable things. And the two responding officers in this case gave Officer Pierce notice that a prudent man needs to go further. And so Pierce took the statement of one accuser, basically, and filled out an affidavit for arrest. So he took limited information, ignored the responding officers, pushed them aside, as Judge Haines said, turned a blind eye. And in turning a blind eye, a reasonable juror could conclude there was not probable cause. But he's got a third part of his qualified immunity analysis. He needs to put himself in the role of a reasonable magistrate. And the role of a reasonable magistrate, he has to determine, is this excluded information material? And he concludes that if the responding officers' statements in the police station were included in the warrant, then but for that exclusion, probable cause would not exist. So he uses a but-for test from the role of the reasonable magistrate and concludes, as a matter of law, that there's no qualified immunity in this case. Certainly, Appellee Dodd supports the public policy behind protecting officers who conduct routine investigations and do it properly. And Kay Yeager testified at the trial. Did she? She did, yes, Your Honor. All right. And she testified that she saw the statements where these officers concluded that they didn't bring any charges as a result of the McDonald's incident. She had an informal oral... I just want to know what she testified to that she knew. She testified that Pierce... She testified, I didn't see a written statement. I don't recall seeing a written statement, but I do recall Pierce mentioning Roberts. Okay, well... That was her testimony in this case. And so in this case, I respectfully ask the court to consider that there are sufficient facts for a reasonable jury to conclude that there was no probable cause and that the Fourth Amendment rights of the appellate were violated. Is it possible that what we really have here is a situation in which one officer thought that two other officers just misjudged a situation? There were two responding officers, Ritherspoon and Roberts, and both testified at trial. Both testified that they told Officer Pierce there was no crime here, there was verbal arguing, that this was not an aggravated assault. They were very clear in the information they gave him. Did they testify, either of them, that there was no gun in the holster? They testified when they arrived at the scene that Officer Witherspoon testified that he checked to see if Mr. Dodd had a carry permit. He did, and that his gun was... Mr. Dodd told him his gun was secured in the console of his truck the whole time, and he didn't ask to look at the gun, but he noticed the empty holster when he arrived at the scene. The jury got to see... Didn't the protective orders situation occur post the McDonald's incident? That's when there was the suggestion, you go get a protective order, and then there was a suggestion that maybe you ought to sue this fellow, and lots changed from that day right at McDonald's, as Mr. Burns is reminding us. He is reminding you, it's an ex parte protective order secured by a minor, Jennifer Simmons. There's a block that can check, was a gun involved? That block's not checked. There was an ex parte order. The order was issued, I take it. An ex parte protective order was issued, never acted on beyond that, but it clearly does not check the gun block. That a reasonable, prudent officer should have said, this person says a gun, this court order says no gun, I should look a little further. The standard is not reasonable, prudent officer. The standard is really reckless, malicious. It's a very strict standard. It's a qualified immunity standard. The jury looks at a prudent officer and the totality of facts. Qualified immunity is a legal question. But then the judge looks at qualified immunity. There's a lot of overlap in the two. They look at a lot of the same. The reckless piece of this is the judge's piece of this. And Judge Haynes in this case concluded that a reasonable juror, a reasonable juror could find a reckless, turning a blind eye was his very word, which is the words that are used in several cases he cites. But he said a reasonable juror can conclude that Officer Pierce turned a blind eye to the responding officers and went forward on limited information. And that is the reckless piece, and then he has to decide the materiality of it. And he did those things. And for those reasons, I'd ask the court, please affirm the decision of the lower court, and thank you for your time today. Thank you, Counsel. Any rebuttal? Thank you, Your Honor. Just a couple of points of rebuttal. First of all, for clarification, there were a couple of ex parte orders of protection that were issued. And I think you have this among the exhibit packets. The one clearly says weapon involved, so there's no question about that. That's the one for Jennifer Rachel Simmons. Two, there was no blind eye turned by Detective Pierce to anything. If he had wanted to turn a blind eye to alleged exculpatory evidence, as I think I mentioned, after he met with the Simmons family members, he could have walked down the hallway at the jail, found the magistrate whose office was literally within just yards of where he was, and started the warrant process then. He didn't do that. He wanted to find out what information the officers who responded to the scene had. He wanted to find out if there was a written report, and he found out there wasn't. To document it properly and to investigate this further, now that he had these other two witness statements, he asked Roberts to put the report together. If we're trying to hide something, why does he do that? In addition, if he's trying to hide something or cover something up or deliberately ignore something, why does he go to the DA and ask her advice? After he spoke with Roberts and after he got the Roberts report, again as a jumping off point, he could have easily then gone to the magistrate and sought the warrant, but he didn't do that. He did that because he was a cautious officer. He didn't want to overcharge or undercharge. He thought that he had something and he wanted clarification as to what it was. The standard here is a high standard, and it's designed that way to protect officers in this position and to protect the process. This case got tried through the prism of guilt beyond a reasonable doubt. I think the jury, respectfully with Judge Haynes' assistance, got confused on exactly what the standard was. The standard was whether or not there was probable cause. Respectfully, if this verdict is allowed to stand, it sends a terrible message to law enforcement across Tennessee and in this circuit because we have an officer who did an investigation, had questions, and then is told by a DA to go get a warrant. To buy their argument, he would have had to have ignored what General Yeager told him and then gone and done other investigation that would not have been material to anything. On behalf of Detective Pierce, I ask that this verdict be reversed. Thank you. I have one question. Yes, sir. Your summary judgment motion before trial based on qualified immunity was, of course, denied. Yes. It was not for clarification, Judge. It was not denied. It was not heard. It was the appeal, the interlocutory appeal, was objected to by a motion to dismiss that Mr. Dodd heard. The court granted that motion to dismiss, and we went back to trial, we went back to the district court. So it was not heard on the merits here. Well, I'm confused now. You did make a motion for qualified immunity before trial. Yes. You didn't win that. Yes, yes. It was denied by Judge Haynes. Yeah, all right. So at least one purpose of the whole concept of qualified immunity is now out the window because you weren't spared going to trial. Correct. So now the trial is there, and the jury is given the issue of probable cause. And at the end of the trial after you lose, you make a motion for judgment as a matter of law. Yes. And is the equation, in your view, the same, or is it a different issue now as to qualified immunity? I think that's a good question, and I candidly will say that I'm not very clear as to what the law in the Sixth Circuit is on that very point. We researched that point heavily. I take the position that we preserve qualified immunity as an argument for directive verdict purposes, Rule 50 purposes at trial, and we, of course, raise that again in the post-trial briefing. I would still say that he is entitled to it. I would say that there were the factual issues, if you will, that Judge Haynes found to exist prior to trial, which denied my motion for summary judgment, were then resolved. And with the proof that came in based upon the record, I argued, okay, Judge, now these questions have been answered. We know what it is. Still, as a matter of law, Detective Pierce should be granted judgment as a matter of law on qualified immunity. Well, that's sort of a slippery concept. I'm thinking, for example, in an excessive force case, if a motion for qualified immunity was denied because the judge found there were disputed questions of facts and then the jury gets the case and they find that excessive force was used, do you get a second bite at the apple on the thing to say that it wasn't? I mean, that just nullifies the jury's verdict. Well, it is slippery. I agree with you. And I have seen some cases that I've studied outside the Sixth Circuit where specifically a procedure is used where special interrogatories are presented to the jury. The jury then answers those questions because they're geared towards those factual issues and questions. And then depending upon what those answers are, defendant would then move and ask again that qualified immunity be granted. Candidly, we didn't do that here in this case. This case got very, very messy at the end. Your motion for judgment as a matter of law,  but it was broader than the issue of qualified immunity. I would agree with that because it was broad to the extent that now that we have this record, I say that no reasonable jury or juror could have said, no, there isn't probable cause and district judge acting as the 13th juror should have seen that, taken that back, and ruled as a matter of law on behalf of Detective Pierce. Well, that standard of could any reasonable juror have found in favor of the plaintiff is a tough standard to overcome in a jury. Well, I'll concede that. I recognize that. I'd prefer to be up here arguing a summary judgment denial as opposed to trying to convince you to reverse a verdict. But with that in mind, I still submit that the record that's been presented before you gives you ample opportunity to reverse this verdict. I submit that this case should not have been submitted to the jury at trial based upon what Mr. Dodd put into the record. I would emphasize again and repeat and encourage you to read closely the testimony of my witnesses, in particular Kate Yeager, who established, I think beyond any type of doubt, that probable cause existed. There wasn't anything omitted. There certainly wasn't anything material that was omitted that would have made any difference to the determination. And again, this sets up a quandary because I have an officer who has done this investigation, didn't turn a blind eye to anything or blow anything off, and he goes and seeks advice from a DA, and I realize that's not the get-ahead-of-jail-free card legally, but he's entitled to rely on that advice, yet Mr. Dodd's argument would be, well, he should have ignored what the DA told him because Pierce knows better than the DA who's going to prosecute this, and Pierce on his own should have gone out and done additional investigation, which would have turned up what? I mean, that is the quandary that the rulings at the trial court level in this verdict have created. And again, I submit that there is enough proof in this record for you to take. Again, I acknowledge the less granted step of reversing a jury's verdict. Thank you. Thank you. Counsel, the case will be submitted. There will be nothing further to come before the court this morning. You may adjourn the court.